JEANNETTE S. SYRELL, as Administratrix of the Estate of LAWRENCE SYRELL, Deceased, Claimant, v. STATE OF NEW YORK, Defendant. (Claim No. 32337.)

Court of Claims, December 14, 1954.

*George S. Sullivan* for claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Edward R. Murphy* of counsel), for defendant.

MAJOR, J. This claim arises out of an accident at the New York State fair on September 12, 1953, when claimant's intestate was fatally injured while watching the 100-mile national championship automobile race, when one of the racing cars hurtled over the outside retaining wall.

On October 9, 1953, Jeannette S. Syrell, the widow of Lawrence Syrell, was appointed administratrix of his estate and as such filed this claim according to law. The claim herein has not been assigned or submitted to any other court or tribunal for audit or determination.

The New York State fair was organized and exists pursuant to sections 31 and 31-c of the Agriculture and Markets Law, under a division known as division of the State fair. At the time of the accident, Mr. Harold L. Creal was and still is the director. This division is charged with the management, control and responsibility of the fairgrounds and all matters pertaining to the fair. Farm products, miscellaneous related matters and educational subjects are exhibited, and amusements, entertainments, including the stock car races and the 100-mile national championship automobile race are conducted.

The fairgrounds, owned by the State of New York, are located in the town of Geddes, County of Onondaga. The State fair is an annual event. In 1953, the fair opened on September 5th and closed on September 12th, the date of the accident. Extensive advertising coverage and numerous methods were used to invite people to the fair. The 100-mile national championship automobile race was specifically listed as a special closing day attraction.

The fairgrounds are enclosed by a high wire fence, and admission to the grounds is only upon presentation of a ticket or a pass. If purchased prior to the commencement of the State fair, the tickets cost 50¢, and if purchased at the State fair gates, cost $1. On the day of the accident, the attendance was approximately 56,151, according to the official records.

The race track, which is located wholly within the fairgrounds, is a one-mile dirt course, elliptical in shape, with two straight courses and two curves, and extends generally easterly and westerly, with a concrete retaining wall around the perimeter. Extending along and about one foot above this wall is a two-inch iron pipe railing held in place by similar size pipe supports about eight to ten feet apart, fastened and bolted into the top of the wall. The construction of the wall was started in 1919, and was completed in 1926; and, except for general upkeep and repair, the wall or railing was not changed prior to the accident. The track is about fifty-three feet wide on the curve at the west end, ninety feet wide in front of the grandstand, and forty-four feet wide on the back stretch. Around the inside of the track, there was a wooden fence, in back of which was a smaller cinder track about twelve feet wide.

The surface of the race track was packed clay construction. At the time of the race in question, it was known as a "heavy surface". Prior to the accident, the racing cars had worn a smooth path in the surface of the track near the inner guardrail, while the side near the wall was softer and rougher. A rut or bump had developed in the curve at the west end causing some of the racers to attempt avoiding such condition by taking a wide swing towards the outer edge of the track.

The curve on the west end, around which came the cars involved in this accident, had a super-elevation from the inside to the outside of seven-eighths of an inch for each foot. The degree of this west curve is eleven degrees, thirty-six minutes.

A curve of eleven degrees, thirty-six minutes with a super-elevation of seven-eighths of an inch for each foot is not sufficiently banked to permit a racing car traveling eighty miles per hour or more to negotiate it without skidding, according to recognized authorities on highway construction and engineering principles.

In the summer of 1953, by contract between a private company and the State Department of Public Works, the track was reconditioned by adding a six-inch thick admixture of sand, clay and calcium chloride to the existing surface, and rolling it down to about four inches in depth, but no changes were made in the degree of the bank on the turns, and no attempt was made to increase the height of the wall or the railing.

This wall was deceptive to a person standing near it. Being of heavy concrete three and one-half feet high from the ground on the spectators' side with the two-inch iron pipe a foot over

the top, gave the impression of strength, stability and protection, but the fact is that the wall on the inside was only two and one-half feet above ground, and the pipe on top connected with the wall only by bolts. This was unsafe, dangerous and inadequate for the protection of spectators standing near the track where this accident occurred.

The State made no tests of any kind prior to the event to determine the speed with which such west curve could be made with safety. During the race in question, participating cars attained speeds of approximately 100 miles per hour.

On the south or "home stretch" side of the track were located the only grandstand and bleachers from which to watch the races, with a full capacity of approximately 10,000 on the day of the accident. Other spectators lined up several deep and jammed against the outside of the concrete wall, milling about, standing and leaning against the wall to watch the races and trials. Spectators were also up against the snow fence used as a barricade on the infield side of the idle cinder track. This method was permitted, condoned, expected and directed at the point of and on the day of the accident, and such had been the practice in prior years.

The AAA national championship 100-mile automobile race was held about 3:00 P.M., on September 12, 1953, in accordance with a contract made between the State Department of Agriculture & Markets, division of the State fair, by Harold L. Creal, director, and Ira Vail, automobile race promoter, dated June 19, 1953, which provided among other things that the State fair division agreed to "furnish the grounds and race track, properly safety-zoned, in compliance with the recommendations as published in the official competition rules book of the Contest Board of the American Automobile Association", agreed to properly treat and prepare the track for the race and "to furnish an adequate number of guards to police said track", and to pay Ira Vail $24,000, from which the latter would pay the salaries and/or premiums of the race drivers. This contract in no way relieved the State of its duty toward those attending the fair. The State could not delegate this responsibility.

The New York State troopers, under the direction of Captain John P. Ronan, had entire responsibility of the safety of those attending the fair, including traffic, prevention of crime, parking, gate attention and protection of those at the automobile races. On the day of the races and the accident, there were 125 to 130 troopers at the fair to look after about 56,151 persons

attending the fair, in addition to those present by reason of duty and business, and covering the many acres of ground and miles of streets, paths, areas, buildings and the midway. Only 40 to 50 of these troopers had charge of the inside and outside of the race tracks, grandstand and affiliated activities. There is no evidence of any deputy sheriffs, village, town or other peace officers being on duty. This number of troopers was far too small for the task to be performed, which explains in some measure the lack of action and system in protecting the crowd around the race track. Aside from walking and standing around the outside of the wall where the accident happened, the trooper at that location acted only as a means of forcing an opening through the crowd, through which private cars or trucks could get in and out of the clubhouse. A loud speaker on an automobile patrolling the cinder track commanded people to keep off the top of the wall and not to lean over the wall, but at no time were people asked to stand back from the wall. This loud speaker could be heard for 500 feet, but this court believes that after the race started with its roar of motors and the cheering of the excited crowds, the loud speaker became somewhat useless.

Claimant's intestate attended the fair and races as an invitee. He was standing along the outside of the concrete wall with the crowd, about in front of the clubhouse on the west curve. The racing cars had been around the track trying for a start, and as they hit the starting line, the cry went up " They're off ", and the next time around the west curve, the leading car arched toward the outside and the second car appeared to mount it and catapult over the concrete wall, taking with it a long strip of the iron pipe railing. Lawrence Syrell was struck either by the car or the iron railing, knocked down unconscious, and was removed to St. Joseph Hospital where he died several hours later without regaining consciousness.

The racing cars traveled counterclockwise, and during the time trials before the race and in the race itself, the cars entered the westerly curve from the back stretch traveling between 80 and 100 miles per hour. These cars negotiated the curve by skidding so that the rear end moved in a partial sideways direction towards the outside of the track, causing clouds of dust and chunks of dirt and clay to be thrown off the track.

An automobile race is a dangerous contest and has many hazards both to participants and to spectators — most anything may happen, such as a collision, skidding, mechanical defects, loss of control or tipping over. Traveling with such velocity,

the potential or ultimate results are unknown until the race is completed. The State agency is chargeable with knowledge and notice of these conditions. There have been many prior automobile racing accidents on this track. The risk is high and the standard of care comparably high.

The State had both actual and constructive notice of the danger and conditions contributing to this accident.

There were no barricades, signs or warnings in the location of the accident where decedent stood and provided by the State for spectators, nor were there any barricades, ropes, signs or warnings or other devices anywhere warning or alerting as to the danger or hazards, or in any way limiting the area or location where spectators might stand. The only police officer on duty in this area was the above-mentioned State trooper, who took no action to keep persons back from the wall. There is no evidence that he had instructions to take such action.

Claimant's intestate was allowed and expected to stand where he did. No warning of danger was given, and he had reason to believe that the place was safe. He cannot properly be charged with assumption of risk, and he was not guilty of contributory negligence.

The State was under a duty to provide decedent with a reasonably safe place.

The State was guilty of negligence and such negligence was the proximate cause of this accident and death of claimant's intestate.

Lawrence Syrell left him surviving as his only heirs at law, next of kin and distributees, his widow and four children, Carol Ann, age eight years; Lawrence W. Syrell, age six years; Beverly Ellen, age five years; and Beadley Gordon, age three years.

At the time of his death, the deceased, Lawrence Syrell, was thirty years of age, with a life expectancy, according to American experience table of mortality, of thirty-five and thirty-three one hundredths years; and his wife was twenty-seven years of age, with a life expectancy of thirty-seven and forty-three one hundredths years. They were married on August 10, 1944, and lived happily together as husband and wife until his death.

In 1942, he was employed at New Process Gear Corporation in Syracuse, New York, and returned to such employment after three years of service in the United States Army, from which he was honorably discharged during the month of February, 1946. Upon his return to his former employer, he received

85¢ per hour. He remained with the New Process Gear Corporation until his death, and was never absent from work due to illness. He was in good health and physical condition. His employer advanced him rapidly. His first jobs were general experimental work in the " Experimental Garage ". He was promoted to group leader on July 23, 1951, and was transferred to the engineering department on a salary payroll instead of the hourly basis in April, 1953. In 1952, his earnings were $5,617.51, or an average of $108.03 per week. In 1953, up to the time of his death, his weekly average was $123.83. He was a steady, industrious worker, showing initiative and willingness, popular and co-operative, with excellent prospects for advancement.

Decedent's wife, Jeannette S. Syrell, devoted her entire time to her home as mother and housewife. After her husband's death, she worked for a while as a switchboard operator at Radio Station WHEN, and later for Morris Distributing Co., Inc. She hired someone to care for her children while at work. She has been constantly under her doctor's care since the death of her husband, and had to quit work in May, 1954. She attended grammar and junior high schools.

The claimant is awarded the sum of $65,000 for all damages, plus $79.75 hospital bill and $1,039.56 funeral expenses, making a total award of $66,119.31, with interest thereon from September 12, 1953.

The foregoing constitutes the written and signed decision of this court upon which judgment may be entered. (Civ. Prac. Act, § 440).

Let judgment be entered accordingly.